# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 21, 2011

No. 10-20729

Lyle W. Cayce
Clerk

CITATION OIL & GAS CORPORATION,

Plaintiff - Appellant

v.

UNITED STATES DEPARTMENT OF THE INTERIOR,

Defendant - Appellee

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:08-CV-01977

Before KING, GARZA, and GRAVES, Circuit Judges.

PER CURIAM:[*]

This suit involves a dispute regarding the royalties owed by Plaintiff-Appellant Citation Oil & Gas Corporation under its oil and gas leases of federal land in North Dakota. The Minerals Management Service, a subagency of Defendant-Appellee the United States Department of the Interior, ordered Appellant to pay additional royalties based on an audit conducted by the North Dakota Office of the State Auditor. Appellant alleges that Appellee made numerous errors in calculating the royalties due, arguing that Appellee

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-20729

improperly applied the marketable condition rule, erred by denying it a transportation allowance, relied on flawed data and methodology, and failed to disclose sufficient information for Appellant to challenge Appellee's findings. After a series of administrative appeals rejecting Appellant's challenges, the district court granted summary judgment in favor of Appellee. We affirm the judgment of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff-Appellant Citation Oil & Gas Corporation ("Citation") leases federal land in North Dakota from Defendant-Appellee the United States Department of the Interior ("Interior"). At all times relevant to this dispute, Citation transferred natural gas to Koch Hydrocarbon Company and its successor Bear Paw Energy (collectively, "Koch") under various processing contracts. Pursuant to these contracts, Koch gathered Citation's unprocessed casinghead gas at or near Citation's wells and transferred the gas to Koch's processing plant over forty miles away. Koch then processed the casinghead gas, yielding dry gas and gas byproducts, including sulfur and liquid hydrocarbons. Koch paid Citation a percentage of the proceeds Koch received from selling the dry gas and gas byproducts, less the costs attributable to treating and compressing Citation's gas and the costs for electricity related to processing the gas.

Under the terms of its leases of federal land, Citation was required to pay royalties on the oil and natural gas it extracted. The North Dakota Office of the State Auditor (the "State Auditor") conducted an audit of Citation's royalty payments on the leases at issue.[1] The audit covered Citation's royalty payments from October 1, 1996, through December 31, 1999, and January 1, 2000, through April 30, 2002. The State Auditor sent Audit Issue Letters to Citation on March

---

[1] Under 30 U.S.C. § 1735(a)(1), the Secretary of the Interior may delegate the responsibility to conduct audits "to any State with respect to Federal land within the state."

No. 10-20729

18, 2003, and August 7, 2003, describing its findings and informing Citation that Citation could provide documents or comments to refute the State Auditor's determinations. In timely responses to these letters, Citation expressed disagreement with the State Auditor's findings but did not provide any additional documentation to support its position. Based on the audit, the Minerals Management Service ("MMS"),[2] a subagency of Interior, issued two orders on November 22, 2003, requiring Citation to report and pay additional royalties because, among other things, it found that Citation had based its royalty payments on amounts that reflected improper deductions of fees for gas treatment and compression. Citation appealed the determination of the MMS, and the Associate Director of Policy and Management Improvement (the "MMS Director") denied Citation's appeal. Citation appealed the MMS Director's determination to the Interior Board of Land Appeals ("IBLA"), which affirmed the MMS Director's decision. Citation then appealed the decision of the IBLA to the United States District Court for the Southern District of Texas, where both parties filed motions for summary judgment. The district court granted summary judgment in favor of Interior, and Citation now appeals the district court's decision.

## II. DISCUSSION

We review the grant of summary judgment de novo and apply the same standard as the district court. *Freeman v. Quicken Loans, Inc.*, 626 F.3d 799, 801 (5th Cir. 2010). We review the appeal of an administrative agency's decision under the Administrative Procedure Act, which provides that a "reviewing court shall . . . set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "unsupported by substantial evidence." 5 U.S.C.

---

[2] MMS was renamed the Bureau of Ocean Energy Management, Regulation, and Enforcement, effective June 18, 2010.

3

§ 706(2)(A), (E). "[T]he standard of review is thus highly deferential to the administrative agency whose final decision is being reviewed[,] and a court 'should not substitute [its] own judgment for the agency's.'" *Tex. Clinical Labs., Inc. v. Sebelius*, 612 F.3d 771, 775 (5th Cir. 2010) (final alteration in original) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1810 (2009)). An agency's "determinations as to purely legal questions are reviewed de novo." *Alwan v. Ashcroft*, 388 F.3d 507, 510 (5th Cir. 2004). Courts "must give substantial deference to an agency's interpretation of its own regulations," giving the agency's interpretation "controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (citation and internal quotation marks omitted). "This broad deference is all the more warranted when . . . the regulation concerns a complex and highly technical regulatory program . . . ." *Id.* (citation and internal quotation marks omitted).

*A. Statutory and Regulatory Framework*

The Secretary of the Interior has the authority to lease federal lands for oil and gas exploration and to enforce mineral leasing laws on federal lands. *See* 30 U.S.C. §§ 226(a), 1701. Lessees pay royalties based on the value of the oil and gas extracted from the federal lands. Under Interior's rules for calculating royalties, unprocessed gas includes "all gas where the lessee's arm's-length contract for the sale of that gas prior to processing provides for the value to be determined on the basis of a percentage of the purchaser's proceeds resulting from processing the gas." 30 C.F.R. § 1206.152. The value of unprocessed "gas sold under an arm's-length contract is the gross proceeds accruing to the lessee," less "applicable allowances." 30 C.F.R. § 1206.152(a)(2), (b)(1). "Gross proceeds" is defined as "the total monies and other consideration accruing to an oil and gas lessee for the disposition of unprocessed gas, residue gas, or gas plant products produced." 30 C.F.R. § 1206.151. The Interior's rules set out various allowances

No. 10-20729

that permit a lessee to deduct certain transportation, processing, and operating costs from its gross proceeds when calculating royalties. *See* 30 C.F.R. §§ 1206.156–160. Thus, these allowances function to reduce the amount of royalties the lessee owes. Under the marketable condition rule, however, a lessee may not deduct costs incurred to place gas in marketable condition. Pursuant to the rule,

> [t]he lessee must place gas in marketable condition and market the gas for the mutual benefit of the lessee and the lessor at no cost to the Federal Government. Where the value established under this section is determined by a lessee's gross proceeds, that value will be increased to the extent that the gross proceeds have been reduced because the purchaser, or any other person, is providing certain services the cost of which ordinarily is the responsibility of the lessee to place the gas in marketable condition or to market the gas.

30 C.F.R. § 1206.152(i). Gas in marketable condition is "sufficiently free from impurities and otherwise in a condition that [it] will be accepted by a purchaser under a sales contract typical for the field or area." 30 C.F.R. § 1206.151. The Secretary of the Interior is required to "audit and reconcile, to the extent practicable, all current and past lease accounts for leases of oil or gas and take appropriate actions to make additional collections or refunds as warranted." 30 U.S.C. § 1711(c)(1).

*B. Marketable Condition*

As discussed above, a "lessee must place gas in marketable condition and market the gas for the mutual benefit of the lessee and the lessor at no cost to the Federal Government." 30 C.F.R. § 1206.152(i). This court has stated that, under the marketable condition rule, "marketing costs cannot be deducted from the gross proceeds, equal to the value of production, before royalty is calculated." *Mesa Operating Ltd. P'ship v. U.S. Dep't of Interior*, 931 F.2d 318, 325 (5th Cir. 1991) (emphasis omitted). Citation argues that it sold unprocessed gas to Koch and that this gas was already in marketable condition. Thus, according to

5

No. 10-20729

Citation, the price Koch paid to Citation was the appropriate amount upon which to base its royalty payments to Interior. Interior, on the other hand, maintains that the costs of treatment and compression were incurred to put the gas in marketable condition and therefore should not have been deducted from Citation's gross proceeds when calculating royalties. Interior stresses that the agreements between Citation and Koch were processing contracts under which Citation was paid a percentage of the proceeds of Koch's sales of the dry gas and gas byproducts. Citation was paid only when Koch sold the gas and gas byproducts, and the amount Citation was paid could not be determined until such sale was made. Further, the amount paid to Citation was reduced by a share of the costs for treatment, compression, and electricity. As a consequence, Interior concluded that Citation's royalty payments should have been based on the amount Citation received from Koch plus Citation's share of the fees incurred for treatment and compression, which Interior determined were required to put the gas in marketable condition.

Citation argues that a 1991 amendment to the Interior's regulations made the marketable condition rule inapplicable to unprocessed gas sold as feedstock under percentage-of-proceeds contracts. Interior contends that Citation waived this argument by failing to raise during proceedings at the administrative level. We agree that, on the record in front of us, it appears Citation did waive this argument by failing to raise it until its appeal to the district court. However, regardless of whether a waiver occurred, we find that the amendment on which Citation relies does not render Interior's application of its valuation standards arbitrary or contrary to law. *See* Revision of Valuation Regulations Governing Gas Sales Under Percentage-of-Proceeds Contracts, 56 Fed. Reg. 46,527, 46,529 (Sept. 13, 1991) (stating that the revision was not expected to "result in a change in royalty collections" and that "gross proceeds may not be the measure of value for royalty purposes when the gas is not sold in marketable condition"). We

defer to Interior's interpretation of its valuation standards on this point. *See Rodriguez-Barajas v. Holder*, 624 F.3d 678, 679–80 (5th Cir. 2010) ("We defer to an agency's interpretation of its own regulation unless an alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation.") (citation and internal quotation marks omitted).

We find that Interior's conclusion that compression and treatment costs should not have been deducted from Citation's proceeds was not arbitrary and should not be set aside. As the district court observed, the price paid to Citation for its casinghead gas was "not based on some index price for casinghead gas. Thus, Citation's contention that the gas clearly was 'marketable,' because someone bought the gas is based on the faulty premise that the casinghead gas was actually purchased for its value as casinghead gas." *Citation Oil & Gas Corp. v. U.S. Dep't of Interior*, 4:08-CV-01977, at 6 (S.D. Tex. Sept. 13, 2010). In light of the fact that Citation's gas was transferred to Koch under processing agreements, as well as the fact that Citation was paid based on Koch's sales of Citation's dry gas and gas byproducts, it reasonably follows that the compression and treatment costs (which were borne, at least in part, by Citation by virtue of the adjustments for costs made by Koch) were incurred to place the gas in marketable condition. Thus, the district court properly granted summary judgment in favor of Interior regarding Citation's improper deduction of costs incurred to place its gas in marketable condition.

Citation also argues that it should have been given processing allowances for the recovery of sulfur and that removal was not necessary to put its gas in marketable condition. However, as the district court noted, this issue is moot because Interior granted Citation a processing allowance for sulfur. *Citation*, 4:08-CV-01977, at 6. The court also correctly noted that Citation waived this argument by failing to raise the issue prior to the appeal to the district court.

*Id.* at 6 n.2 (citing *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 764–65 (2004)).

*C. Transportation Allowance*

Citation argues that it is entitled to a transportation allowance that would eliminate or greatly reduce the amount of additional royalties it owes. As discussed above, Interior's rules provide for the deduction of transportation costs from the amount upon which royalties are based under certain circumstances. *See* 30 C.F.R. § 1206.156. Interior's rules set out a procedure for seeking a transportation allowance and require a lessee to claim "a transportation allowance by reporting it" on a specified form. 30 C.F.R. § 1206.157(a)(1)(i). Citation, however, never filed the appropriate form requesting the allowance. Similarly, Citation failed to assert any entitlement to such an allowance until its appeal to the IBLA. Citation argues that it was nonetheless entitled to a transportation allowance by virtue of its assertions before the IBLA. Citation contends that an audit should aim to correct both underpayments and overpayments and that the denial of a transportation allowance would run contrary to 30 U.S.C. §§ 1721 and 1721a, which permit a party to request a refund during an audit. Interior, on the other hand, maintains that adherence to the procedural requirements for seeking a transportation allowance was required. Interior further asserts that Citation failed to demonstrate its entitlement to a transportation allowance and has noted that it would be forced to search Citation's records to determine whether any such allowance was proper. As the district court observed, although "MMS must give the transportation allowance when a lessee qualifies," MMS is not required "to comb a lessee's records to determine if that lessee is entitled to a transportation allowance." *Citation*, 4:08-CV-01977, at 7. Consequently, we cannot say that the IBLA's decision to hold Citation to the procedural requirements set out in Interior's rules was arbitrary and capricious or should otherwise be overturned.

Thus, the district court's grant of summary judgment in favor of Interior regarding the denial of a transportation allowance was proper.

*D. Interior's Use and Disclosure of Data from Exxon*

Citation contends that Interior's order for additional royalties with regard to two leases in the Big Stick Unit ("BSU") was arbitrary and capricious because the agency relied on flawed data and methodology. Citation further asserts that Interior acted arbitrarily by failing to disclose sufficient information for Citation to understand, and potentially challenge, the factual and legal basis of Interior's calculations. *See Exxon Co., U.S.A.*, 113 IBLA 199, 205 (1990) ("The recipient of a decision deserves a reasoned and factual explanation of the rationale for the decision, and must be given some basis for understanding it and accepting it, or, alternatively, for appealing and disputing it."). Citation has the burden of demonstrating that "the methodology used in the Government's computation is, in fact, erroneous." *BWAB, Inc.*, 121 IBLA 188, 195 (1991). "Conclusory allegations of error, standing alone, do not suffice." *United States v. De Fisher*, 92 IBLA 226, 227 (1986).

During the audit of Citation's royalty payments, the State Auditor requested documentation from Citation. Citation, however, failed to provide documentation for two leases in the BSU. Because Citation did not provide the requested information, Interior relied on receipts from Exxon, the operator of the unit, for calculations related to these leases. The State Auditor provided summaries showing the calculations, but Citation asserts that Interior was obligated to provide the primary source documents on which the calculations were based.

Interior notes that Citation did not request the primary source documents from the State Auditor or Exxon. Further, the IBLA has characterized the methodology used to calculate the royalties due as relatively straightforward and easily discernible from the information provided in the letters from the State

No. 10-20729

Auditor and the orders that issued on November 2, 2003. In addition, the letters from the State Auditor clearly indicated to Citation that it could provide such documents to change the determination that more royalties were owed. However, as stressed by the district court, "Citation made no effort to supply the actual records or suggest any alternate method of calculation." *Citation*, 4:08-CV-01977, at 8–9.

We conclude that, because Citation failed to provide records that controvert Interior's calculation of royalties, the reliance on data from Exxon with respect to the two leases in the BSU was reasonable. Moreover, in light of Citation's failure to request the primary source documents from the State Auditor or Exxon, as well as the IBLA's characterization of the relevant calculations as easily discernible and relatively straightforward, we do not find that Interior failed to provide a sufficient explanation of its determination that Citation owed additional royalties under the two BSU leases.

Citation further argues that Interior's determination should be set aside because a subsequent order issued by Interior conflicts with those at issue in this case. Citation relies on an order issued on September 15, 2008, that, according to Citation, used data and methodology that conflict with the data and methodology used by Interior in the calculations in the present dispute. However, the mere fact that an order—one that issued roughly six months after the IBLA issued its final decision—might differ from the orders at issue in the instant case does not demonstrate that Interior acted in an arbitrary manner or even reached an incorrect result in the instant case.[3] Moreover, as the district court noted, "none of Citation's arguments explains why Citation did not simply supply [the] North Dakota [State Auditor] with the proper documentation when the issue first arose." *Citation*, 4:08-CV-01977, at 9. In addition, as we

---

[3] Citation itself asserts that the order that issued on September 15, 2008, is incorrect.

No. 10-20729

discussed above, Citation has not offered its own calculations, provided supplemental documentation, or otherwise shown that Interior arbitrarily reached its determination regarding the royalties owed on the BSU leases. Thus, its argument regarding Interior's subsequent order is unavailing.

*E. Interior's Use of Estimates*

Finally, Citation asserts that Interior's use of estimates for the months it did not audit was arbitrary because Interior had access to actual data.  Citation asserts that courts have rejected attempts by agencies to rely on estimates in similar situations, but the cases Citation references do not support this position. *See Chem. Mfrs. Ass'n v. EPA*, 28 F.3d 1259 (D.C. Cir. 1994); *Tex Tin Corp. v. EPA*, 992 F.2d 353 (D.C. Cir. 1993).  Both *Tex Tin Corp.* and *Chemical Manufacturers Ass'n* involved situations in which the agency had relied on general information or assumptions in the face of specific evidence to the contrary.  *Chem. Mfrs. Ass'n*, 28 F.3d at 398; *Tex Tin Corp.*, 992 F.2d at 355.  As the district court noted, "[t]he IBLA stated, and the record supports the fact, that Citation never proffered any other methodology for calculating the total costs." *Citation*, 4:08-CV-01977, at 9–10.  We do not find that  the IBLA acted arbitrarily by concluding that Citation had not met its burden of showing that Interior's methodology was flawed.  Consequently, we find that the district court's grant of summary judgment in Interior's favor was proper.

## III. CONCLUSION

For the reasons stated above, we AFFIRM the judgment of the district court granting summary judgment in favor of Interior.  Costs shall be borne by Citation.